No. 8 February 16, 2017 47

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

RYLEY JEANNE MORGAN,
*Petitioner on Review.*

(CC 11CR0886; CA A152692; SC S063831)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 23, 2016.

Marc D. Brown, Chief Deputy Defender, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

WALTERS, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for entry of judgment and resentencing as ordered by the Court of Appeals.

_____
  * Appeal from Josephine County Circuit Court, Thomas M. Hull, Judge. 274 Or App 792, 364 P3d 690 (2015).

**WALTERS, J.**

In this case, we hold that, to establish that defendant was "aided by another person actually present" and therefore was guilty of second-degree robbery under ORS 164.405(1)(b), the state was required to prove that the person who aided defendant acted with the intent to facilitate the robbery. Because the state proffered evidence from which a rational trier of fact could have reached that conclusion, we affirm the judgment of the trial court and the decision of the Court of Appeals. *State v. Morgan*, 274 Or App 792, 794, 364 P3d 690 (2015).

For reasons that we will explain, we summarize the relevant facts in the light most favorable to the state. Defendant's boyfriend, Thornton, dropped off defendant and the couple's child at a department store. Defendant entered the store and took clothing into a fitting room to try it on. Recognizing suspicious behavior, security officers began to monitor defendant's actions and noticed that, after defendant had left the fitting room, two items of clothing were missing. Soon thereafter, Thornton returned to the store and held the child while defendant continued to try on clothing. Defendant left the fitting room a second time, and the security officers noted that two additional items were missing. Two officers—Marshall and Waltz—and the store manager waited for defendant and Thornton to pass all points of sale and leave the store, and then followed them to the parking lot.

In the parking lot, Waltz approached defendant as she walked to the car that Thornton was driving, showed defendant his badge, and said, "Ma'am[,] I'm with store security and we need to talk about some merchandise that wasn't paid for." As Waltz approached defendant, he yelled, "Store security. Stop." Defendant responded, "You're not taking me to jail," and jumped into the car on the passenger's side. Waltz grabbed defendant's right arm and told her to get out of the car, but defendant refused and pulled her arm back.

Thornton, who was seated on the driver's side of the vehicle, knew that the officers were loss prevention officers.

He heard the officers state that they were security personnel, and he knew that they had come to the car to question defendant because of her having been in the store. Thornton was also aware of defendant's history as a repeat property offender.[1] Nevertheless, Thornton started the car. Waltz continued to hold onto defendant's arm, and, with defendant's door still open, Thornton began to drive. Waltz let go of defendant, and Thornton drove forward toward Marshall and the store manager, who were standing in front of the car. Marshall avoided being hit by "push[ing] off the front of the car," but the car hit the store manager, who was unable to get out of the way. Thornton sped away "extremely fast" and ran a red light as he and defendant left the store parking lot.

The state charged defendant with second-degree robbery under ORS 164.405(1)(b), based on allegations that she had committed third-degree robbery and had been "aided by" Thornton, "another person actually present." During her bench trial, defendant raised questions about what was required to sustain a conviction for second-degree robbery and challenged the legal sufficiency of the state's evidence. In her closing argument to the trial court, she argued that "aiding requires something more than merely driving off in the vehicle" and that "[Thornton] has to know what [defendant] did." Defendant argued that Thornton did not have that knowledge and that the only evidence was that he drove the car out of the parking lot out of self-interest, to avoid being caught in possession of drugs. The trial court disagreed with defendant's statement of the law. The court explained that the person aiding defendant was not required to have any knowledge of the specific crime being committed: "All I have to *** find is that [Thornton] knew that [defendant] was being sought for something, it was nefarious, criminal, and that he was aiding her to leave and get out of there." The court found that "there clearly was an intent *** to aid the defendant."

_____

[1] The following evidence was admitted without objection or limitation in the guilt phase of defendant's trial. Defendant and Thornton had been in a romantic relationship since 2009. During their relationship, defendant had been admitted into a judicial program in Jackson County to rehabilitate repeat property offenders. Two convictions led to her admission into that program: first-degree burglary and first-degree theft.

Defendant appealed to the Court of Appeals and argued that, to convict her of second-degree robbery, the state had to prove that Thornton was her accomplice—that he had acted with the specific intent to promote or facilitate the commission of the robbery. *Morgan*, 274 Or App at 797.[2] The Court of Appeals disagreed, concluding that "ORS 164.405(1)(b) does not require that 'another person actually present' who aids a defendant must know that the defendant is committing theft." *Id.* at 794. In fact, the court explained in a footnote, ORS 164.405(1)(b) does not include a mental state requirement for the person who aids the defendant; that person need not know, the court opined, that the defendant is engaging in something "nefarious [and] criminal." *Id.* at 801 n 3 (brackets in original). The court reasoned that "the focus of ORS 164.405(1)(b) is defendant's mental state and defendant's use of 'another person actually present,'" rather than the mental state of the person providing the aid. *Id.*

In reviewing whether the evidence was sufficient to satisfy the legal requirements of ORS 164.405(1)(b), the court deemed the relevant standard to be "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.* at 801. Because the court understood ORS 164.405(1)(b) to require only that Thornton was in proximity to the victim, it concluded that the evidence presented at trial met that standard, and affirmed. *Id.* at 801-02.

Defendant sought review in this court, and we allowed her petition. The standard of review that we should apply depends on the nature of the objection that defendant is pressing. In closing argument in a criminal case, a defendant may make a number of arguments: for example, a defendant may challenge the sufficiency of the evidence

---

[2] Before the Court of Appeals, defendant also assigned error to the trial court's failure to merge defendant's third-degree robbery conviction with her second-degree robbery conviction. *Morgan*, 274 Or App at 802. The state conceded that the trial court had erred, and the Court of Appeals reversed defendant's convictions for second-degree robbery and third-degree robbery and remanded to the trial court for resentencing. *Id.* Accordingly, that issue is not before this court on review.

or make an argument for the existence of an element that the state must prove. We consider the former to be the functional equivalent of a motion for judgment of acquittal and the latter to be the functional equivalent of a challenge to jury instructions. *See State v. Gonzalez-Valenzuela*, 358 Or 451, 454 n 1, 365 P3d 116 (2015) (explaining distinction).

Here, the precise nature of defendant's trial court argument is somewhat unclear. In this court, however, defendant's argument is best understood as a challenge to the sufficiency of the evidence. First, defendant does not assign error to the standard of review applied by the Court of Appeals—a standard that applies when a defendant challenges the sufficiency of the evidence. Second, in this court, defendant does not explicitly contend that her argument in the trial court was the functional equivalent of a challenge to a jury instruction. Instead, she primarily frames her argument as a challenge to the sufficiency of the evidence. Accordingly, we limit our review to determining whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the state had proved the essential elements of the crime beyond a reasonable doubt. *See State v. Rose*, 311 Or 274, 281, 810 P2d 839 (1991) (reviewing challenge to sufficiency of the evidence to determine whether any rational trier of fact could have found essential elements of crime proved beyond a reasonable doubt).

To make that determination in this case, we first consider the essential elements of the crime of second-degree robbery. The second-degree robbery statute, ORS 164.405(1)(b), provides, in part:

> "(1)  A person commits the crime of robbery in the second degree if the person violates ORS 164.395 and the person:
>
> "* * * * *
>
> "(b)   Is aided by another person actually present."

ORS 164.395 defines the crime of third-degree robbery:

> "(1)  A person commits the crime of robbery in the third degree if in the course of committing or attempting to

commit theft *** the person uses or threatens the imme-
diate use of physical force upon another person with the
intent of:

"(a)    Preventing or overcoming resistance to the taking
of the property or to retention thereof immediately after
the taking[.]"

Thus, to prove that a defendant committed second-degree
robbery under ORS 164.405(1)(b), the state must establish
that the defendant committed third-degree robbery and
that the defendant was "aided by another person actually
present."

The issue in this case is what evidence is neces-
sary to prove that a defendant was "aided by another per-
son actually present." Defendant contends that the state is
required to present evidence that the person who was pres-
ent and who provided aid acted as an accomplice—someone
with the specific intent to promote or facilitate the commis-
sion of the acts constituting third-degree robbery. The state
responds that it is not required to present evidence that the
person who provided aid acted with a specific mental state.
According to the state, a defendant is "aided by another per-
son" if that person engages in conduct that in fact facilitates
the commission of the robbery, even if the person does so
without knowing that the person is providing aid. Thus, the
state argues, a person who unwittingly opens the door for a
robber fleeing a store with stolen merchandise provides suf-
ficient aid to elevate third-degree robbery to second-degree
robbery.[3]

Before considering those opposing positions, we
think it important to observe that the issue that the parties
raise is not the requisite mental state of a defendant who is

[3] The state's position on review is different from its position before the trial
court. At trial, the court asked the prosecutor if Thornton, as the getaway driver,
had to "know anything about what's been going on." The prosecutor responded,

"The driver is going to have to intentionally aid and abet the criminal con-
duct. *** His act was driving away, knowing she had committed the crime of
theft. That is when he becomes an aider and abettor."

The court then clarified, "Does he have to know that it's theft conduct, or can he
just know that he's aiding somebody in something nefarious?" The prosecutor
shifted her position, explaining,

"All *** that he has to know [is] that there is a crime being, that he's aiding.
The type of crime? No, *** it doesn't require that."

charged with second-degree robbery. The parties acknowledge that, to be convicted of a crime, a defendant must have acted with the requisite mental state for every "material element" of the offense, and that the material elements of second-degree robbery include the fact that the defendant was "aided by another person actually present." *See* ORS 161.095(2) (person not guilty of offense unless person acts with culpable mental state with respect to each material element that necessarily requires culpable mental state); *State v. Simonov*, 358 Or 531, 539-40, 368 P3d 11 (2016) (minimum culpable mental state for a conduct element is knowledge, and minimum culpable mental state for a result or circumstance element is criminal negligence). The parties also do not ask this court to determine the mental state that a defendant must have with regard to that element. The parties do not ask whether a defendant must know that he or she is receiving aid, or whether some other mental state is required, and we do not consider that question. We raise it only to point out the distinction: Although defendant is the person who is accused of the crime of second-degree robbery, it is not defendant's mental state—but rather the mental state of another person who was present at the time of the robbery—that is the subject of this appeal.

We begin our analysis of that issue with the text of ORS 164.405(1)(b) and the state's argument that the requirement that a defendant be "aided" by a person present is a requirement that the person present engage in certain conduct, and that proof of an accompanying mental state is unnecessary. Because the statute does not define the term "aided," we consider its plain meaning. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295, 337 P3d 768 (2014). When the Criminal Law Revision Commission drafted the statute, "aid" was defined as "to give help or support to," or "contribute to." *Webster's Third New Int'l Dictionary* 44 (unabridged ed 1961). *Black's Law Dictionary* similarly defined "aid" as "[t]o support, help, assist or strengthen"; "[a]ct in cooperation with"; "[s]upplement the efforts of another." *Black's* at 91 (rev 4th ed 1968). The state contends that those definitions focus on the aider's conduct and suggests that an aider's mental state is irrelevant to the question whether aid was provided.

We read those definitions differently. Those definitions are replete with verbs—"help," "support," "assist," "contribute," and "cooperat[e]"—that typically connote an intent to facilitate an outcome. If one were to describe a person as "assisting" another, the listener would immediately wonder what outcome the individual was trying to achieve. A common use of the word "assist" would be in a phrase such as, "He is assisting his elderly father in eating," or "She is assisting her partner in her run for office." Those uses connote an intent to facilitate the outcome—eating or election to office. To connote assistance without the intent to facilitate the outcome, one generally would use an additional modifying adverb, such as "unintentionally" or "unwittingly." Without such a modifier, the typical understanding of, for example, the statement, "Sally assisted the criminal," would be that Sally acted with the intent to facilitate the criminal outcome. The words "help," "support," "contribute," and "cooperat[e]" also connote an intent to facilitate a particular outcome. The legislature's use of the word "aided" without specifying that the aider act with a particular mental state does not convince us that the state is correct that the legislature intended to make conduct alone the relevant consideration.

We turn therefore to the next argument that the state makes—a contextual argument. The state points to the accomplice liability statute, ORS 161.155, and argues that, when the legislature intends to require that a person who provides aid act with a culpable mental state, it expressly imposes that requirement. ORS 161.155 provides, in part:

> "A person is criminally liable for the conduct of another person constituting a crime if:
>
> "* * * * *
>
> "(2)   With the intent to promote or facilitate the commission of the crime the person:
>
> "* * * * *
>
> "(b)   Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"

The state argues that the accomplice liability statute does not merely rely on the plain meaning of the term "aids or abets" to impose a requirement of criminal intent, but, in addition, requires that the person providing aid must have "the intent to promote or facilitate the commission of the crime." ORS 161.155(2). Thus, the state suggests, when the legislature used only the word "aided" in ORS 164.405(1)(b) and failed to include the additional requirement that the person acted with the intent to promote or facilitate the crime of robbery, the legislature required conduct that provides assistance but did not require an accompanying mental state.

That is not the only way that the legislature has described accomplice liability, however. ORS 163.165 defines assault in the third degree and provides that fourth-degree assault is elevated to third-degree assault when the defendant, while being "aided by another person actually present," causes physical injury to the victim.[4] ORS 163.165(1)(e). We interpreted ORS 163.165(1)(e) in *State v. Pine*, 336 Or 194, 82 P3d 130 (2003), and *State v. Phillips*, 354 Or 598, 317 P3d 236 (2013). In those cases, the question was whether the person who provided aid to the principal in the assault also could be convicted of third-degree assault. *Pine*, 336 Or at 196; *Phillips*, 354 Or at 602. We explained that the answer turned on whether, in aiding in the assault, the third person "caused" the victim's physical injury. *Pine*, 336 Or at 207; *Phillips*, 354 Or at 603. We held that, if the act that aided the assault also can be said to have caused it, then both the third person and the principal can be held liable for third-degree assault. *Pine*, 336 Or at 207; *Phillips*, 354 Or at 603. Although not expressly discussed in those cases, our holdings rested on the premise that, to be guilty of third-degree assault under ORS 163.165(1)(e), the person who aided in causing the physical injury must have acted intentionally.

---

[4] ORS 163.165(1) provides, in part:

"A person commits the crime of assault in the third degree if the person:

"* * * * *

"(e) While being aided by another person actually present, intentionally or knowingly causes physical injury to another[.]"

In reaching our decision in *Phillips*, we traced the phrase "aided by another person actually present" to its common law origins. We explained that

> "[t]he common law divided persons charged with felonies into three classes: principals in the first degree; principals in the second degree; and accessories before the fact. *See* Wayne R. LaFave, 2 *Substantive Criminal Law* § 13.1(b) (2d ed 2003). '[A] principal of the first degree is one who does the act, either himself directly, or by means of an innocent agent.' Joel Prentiss Bishop, 1 *Commentaries on the Criminal Law* § 456 (2d ed 1858). 'A principal of the second degree is one who is present lending his countenance and encouragement, or otherwise aiding, while another does it.' *Id.; accord* James Fitzjames Stephen, 2 *A History of the Criminal Law of England* 230 (1883). At common law, a principal in the second degree could be actually or constructively present. Bishop, *Criminal Law* § 460; LaFave, 2 *Substantive Criminal Law* § 13.1(b). Finally, a person who aided and abetted the commission of a crime but who was not actually or constructively present was an accessory before the fact. Bishop, 1 *Criminal Law* §§ 473-74."

*Phillips*, 354 Or at 609-10. Thus, the phrase "aided by another person actually present" mirrors the common-law requirement for liability as a principal in the second degree. *See id.* at 610 ("If the person caused the injury because that person's conduct was extensively intertwined with the injury's infliction, that person would be a principal in the second degree; that is, he or she would be a person who, while actually present, aided the infliction of physical injury."). Thus, when the legislature used the phrase "aided by another person actually present" in the third-degree assault statute, it used that phrase to refer to a person who acts intentionally and who could be held liable as an accomplice. The legislature may have intended to do the same when it used that same phrase in ORS 164.405(1)(b).

The legislative history of ORS 164.405(1)(b) confirms that hypothesis. *See [State v. Walker](#)*, 356 Or 4, 17, 333 P3d 316 (2014) (if appropriate, court considers legislative history in interpreting a statute). The commentary to the second-degree robbery statute refers to the third person whose aid elevates the crime of third-degree robbery to the

crime of second-degree robbery as a "criminal" or an "accomplice," and to the principal and the aider together as "professional criminals":

> "The primary rationale behind paragraph (b) of subsection (1) of § 149 [robbery in the second degree] is the increased danger of an assault on the victim when the robber is reinforced by another *criminal* who is actually present. Furthermore, when two or more persons commit the crime, it indicates greater planning and more likelihood that they are *professional criminals*. *** However, the Commission was of the opinion that the *accomplice* circumstances, while aggravating the crime, are less serious than those specified in § 150 [robbery in the first degree]."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 148-50 (July 1970) (emphases added).

Furthermore, during the Criminal Law Revision Commission subcommittee meetings, Paillette, the commission's Project Director, explained that the purpose of the new robbery statutes was to "shift[] the focus of attention from the taking of property to the risk of injury and violence to the victim." Audio Recording, Criminal Law Revision Commission, Subcommittee No. 1, June 22, 1968, Tape 7, Side 2. He continued, "What we're trying to prevent [and] punish is physical danger to the victim." *Id*. Addressing specifically the second-degree robbery statute, Paillette commented that the presence of "two or more robbers" increases the danger to the victim, and added that, when "multiple robbers" are involved, the type of injury that could be inflicted on the victim is serious enough to make the crime punishable to a greater extent than if only one "robber" is present. *Id*.

The state contends that, although the legislative history indicates that the legislature may have envisioned that the other "person actually present" who aids in a robbery would be a criminal or an accomplice, it did not so limit the scope of the second-degree robbery statute. The legislature settled on the general terms "person" and "aided" rather than selecting narrower terms; accordingly, the state argues, this court should respect that choice and decline to "draw a line that the legislature itself declined to draw" by

reading the statute to require a mental state on the part of the aider. *See Walker*, 356 Or at 22 ("For us to interpret the statute more restrictively than it was consciously drafted would require us to draw a line that the legislature itself declined to draw.").[5]

The state is correct in that observation, but, here, we do not use that legislative history to vary statutory terms; instead, we use it to help us to determine what the legislature meant by those terms. The drafters of ORS 164.405(1)(b) discussed their intent to elevate third-degree robbery to second-degree robbery when another person actually present is acting as a "criminal," an "accomplice," or a "robber." That legislative history supports defendant's textual and contextual arguments, and we conclude that, when the legislature required the presence of a third person providing "aid" to a defendant, it intended to require the state to prove that that person acted with an intent to promote or facilitate the defendant's acts.

We also conclude that, viewing the evidence in the record in the light most favorable to the state, the trial court could have found that Thornton was aware of facts that constituted the crime of third-degree robbery and acted with an intent to promote or facilitate the robbery. As an initial matter, the trial court could have found that Thornton was aware that defendant had taken merchandise from the store without paying. Thornton knew that defendant had been trying on clothes in the store and that, after they left the store, security officers were trying, both verbally and physically, to prevent defendant from leaving. Because the security officers did not try to stop defendant until after she had left the store, as is typical with suspected shoplifters, Thornton reasonably would have been aware that the security officers believed that defendant had committed theft. And there was

---

[5] The state also argues that the legislature could not have intended to require that the third person be an accomplice because a person who aids or abets a criminal act under the accomplice liability statute, ORS 161.155(2)(b), need not be "actually present" to be criminally liable. That argument is not well-taken. In ORS 164.405(1)(b), the legislature selected a narrower form of common-law accomplice liability that does require actual presence and that thus advances the legislature's concern that an accomplice who is actually present at the commission of a robbery increases the risk of harm to the victim.

evidence from which the trier of fact could have found that Thornton credited those theft claims. Defendant's resistance permitted a reasonable inference that the security officers' claims of theft were valid, as did Thornton's knowledge of defendant's history as a repeat property offender. Finally, a rational trier of fact could have inferred from Thornton's reaction—speeding away from the store—that he believed that defendant had stolen property from the store. Although Thornton testified that he drove the car out of the parking lot out of self-interest, to avoid being caught in possession of drugs, a rational trier of fact would not have been required to accept that testimony.

Furthermore, because Thornton watched defendant physically resist the security officers' efforts to detain her, the court could have inferred that Thornton was aware that defendant had committed acts (theft plus the use of force to retain the stolen property) that constitute robbery. Finally, a rational trier of fact could have found that Thornton intentionally aided defendant in retaining the property that she had shoplifted. He drove the car away, nearly hitting one employee (Marshall), hitting a second employee (the store manager), and separating defendant and the stolen property from the third employee (Waltz) who was trying to hold on to her. Not only could the court have found that Thornton intentionally promoted defendant's commission of the robbery, but it also could have found that Thornton's use of the car to separate defendant and the property from the store employees was sufficient in and of itself to constitute the force necessary to elevate defendant's theft to a robbery. The trial court correctly denied defendant's motion for judgment of acquittal.

Defendant's contrary argument is based not on findings that the trial court could have made, but on a finding that the trial court did in fact make. As defendant notes, the trial court did not find that Thornton knew that defendant had committed theft; rather, the court found that Thornton knew only that defendant had been engaged in "some sort of nefarious activity, a crime at the least." The court explained that that mental state was sufficient to say that Thornton had aided defendant's theft. Focusing on that

factual finding, defendant argues that the trial court should have granted her motion for judgment of acquittal.

The problem with defendant's argument is that it is contrary to the standard of review that we have determined applies here. As we have explained, our task is to determine whether there is evidence from which a reasonable trier of fact *could* find the elements of the crime. That the trial court did not find those elements does not mean that it reasonably could not have found them. Given the particular procedural posture in which this case comes to us, we will not disturb the trial court's judgment.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for entry of judgment and resentencing as ordered by the Court of Appeals.